Our fourth and last argument this morning is document number 24-1770. This is IBM v. Zillow Group, Incorporated. Counsel, whenever you're ready. Thank you, Your Honor. May it please the Court. Kareem Usaiyaf for IBM. Your Honors, this Court should reverse because the Board's final written decision deviated from the theory set forward in the petition. Specifically, the petition advocated a theory in which the Sonata prior art reference disclosed a protected resource. And that was an explicit decision in the petition. And if we look at Appendix 142, we can see that explicit decision. Your argument is that the Board abused its discretion in reading the petition differently. Is that right? Your Honor, I think it's explicit how the petition should be read. And yes, the Board abuses discretion by deviating from how it can only be read. And if I may, Your Honor, let me show the Court why it's so explicit. On Appendix 142, you have the preamble of the claim. And right under the header, it says, as per the CAIAC IPR in the IANCO decision, Sonata discloses all preamble limitations except for potentially an FCE. And that's short for Federated Computing Environment. So the entire preamble, the theory was Sonata discloses those elements. And one of those elements is, of course, the protected resource. Now, why was the petition so explicit about the disclosure theory? It was so explicit because it was citing the CAIAC IPR. That is an IPR that happened before. And the goal of the petition was to apply collateral estoppel. So the CAIAC IPR found that Sonata discloses the protected resource. Now, as it turns out, the board didn't apply collateral estoppel, and Zillow doesn't appeal that because there was a change in the law about how to interpret claims. However, this is why the petition is so explicit about disclosure. So what about other areas? Like on page 8146, midway through the page, it says, the person who organized felony art would have understood from Sonata how to ensure that restricted resources were only accessed by appropriate users. Is that something different than saying disclosed? Is that saying suggested? Your Honor, can you show me exactly where that is? It's midway through the page, and it starts, again, page 8146. There's really only one paragraph there. The further paragraph, you go about six lines down, and there's a sentence that starts with over. Which appendix, Your Honor? 146. 146. So page 146, Your Honor, is concerning the FCE limitation. So if we look on appendix 143, there's a conclusion paragraph right in the middle, and it says thus. I hear you, but could you look at the sentence I'm asking you about just to tell me what it says? Yes. Okay, it says, moreover, a person who organized felony art would have understood from Sonata how to ensure that restricted resources were only accessed by appropriate users. So how does that relate to whether Sonata discloses protected resources or whether it suggests protected resources? Doesn't it all relate to that? I'm just looking at the sentence that kind of jumped out at me. I understand, Your Honor. So first of all, the answer would be that's in the context of FCE, but setting that aside. The second thing is if we look at the construction that the board applied, the construction of protected resource that is undisputed on appeal is that it needs to be identified by a URL or a URI. And that's on The time the petition was written, that hadn't been determined or had it been? That had not been determined at the time the petition was written. So is the party allowed to further explain its positions?  When there's, you know, later on, it's more like responsive to arguments made by the pattern. If it's consistent with the argument that's advanced in the petition, but here it's not, it's not consistent. And I would say, you know I'm sorry, I'm sorry. The extent of the word consistent means normally. Of course it's consistent. It's explicit, and if not explicit, implicit. And there's no inconsistency. So what do you mean by inconsistent? So I would refer Your Honor to Appendix 128. And this is where the petitioner sets forward what the petitioner is trying to do. Did you say 128? Appendix 128, yes. So what we're looking at here is part of the petition. And what it says is under Section G, Collateral Estoppel, it talks about how in the first sentence it sets the framework, and in the second sentence it says, Accordingly, it is inappropriate to deviate from the previously determined issues per the CIDAC IPR. Specifically, that SUNADA discloses every limitation at issue in the CIDAC IPR, with the possible exception of an FCE. So this, it sets out a distinguishing two parts of the argument. It says, okay, so there's the FCE parts, and there's the non-FCE parts. And what we're arguing here is that everything except for the FCE parts is disclosed, and the FCE parts is something that we're going to add additional arguments to. And the reason why they do that is because if they deviated from the CIDAC IPR and started talking about suggestions or, you know, whether it was obvious or some other argument, they wouldn't be able to use Collateral Estoppel. That was the whole purpose of the petition. But let me just, as I understood Judge Stoll's question about whether you make a declaration and later you're going to elaborate on it. Now, to contradict it would be one thing, but to say in the language interpretation business, we think that this is absolutely plain on the face of SUNADA. But we understand that, you know, you might disagree. And if you disagree with the plainness, it is still enough to implant in the skilled artisan's head the idea, suggest what teaching, any other softer term. That's not an inconsistency. That doesn't undermine the assertion. We think it's plain enough that Collateral Estoppel would be covered. I don't, I guess I don't really see why, how you can press this so hard as a right-wing distinction that it's a complete change of theory. Yes, Your Honor. I mean, I would go back to Appendix 142 and look at how the petition structures the analysis on the preamble. Specifically, it starts out arguing about all, everything except for the FCE. And then it makes a clear break to the FCE part of the claim. And it, on page Appendix 143, the next page, it says, thus as the PTAB correctly found in the CAYAC IPR, SUNADA discloses the non-FCE preamble limitations. Then it says, okay, we set the table for the non-FCE parts. It says, as for the FCE limitations, here's our argument. And that's the context in which the rest of the argument is made. So, you know, the headers that people use to break up the claims is, to a certain extent, arbitrary. Different people could break up an element that people think is just one. What about the discussion of element 1.1 that's on page, like, A146 to 147? I'm just curious about that, because that, of course, is another limitation that refers to a protected resource. Yes, Your Honor. And there, in discussing that limitation, it points out, for example, SUNADA discloses that a user may gain access to a protected service, I think that's resource, on a web application. I mean, so isn't that talking more about what SUNADA teaches with respect to a protected resource? I think, Your Honor, 1.1 supports our position because it gives an independent basis to find that it's a disclosure argument for this element, too. So, in my reading of appendix 146, it starts off that as the PTAB found in the CAYAC IPR, SUNADA discloses this limitation. And then, in the part that you read... Okay, so then you come back, and there's this claim construction. The claim construction says the protected resource has to have a URL or URI. One of those two, yes. And then the response is, well, SUNADA discloses a protected service on a web application. So that must have a URL or URI. Why isn't that just further explanation of the point as opposed to a contradictory or new argument? Because, Your Honor, the final written decision explicitly says that SUNADA does not disclose a URI or a URL. And if we look at appendix 17, that's the final written decision. And when we look at the final written decision, appendix 17, just a second. Right after the block quote, it says, consistent with petitioner's concession, we find that petitioner has not shown that SUNADA discloses protected resources under our claim construction. So the board analyzed the evidence and thought, well, maybe they elaborated on this disclosure theory, and maybe they proved that SUNADA actually discloses a protected resource. But we've been through all the evidence. At the same time, the board later says that both, it finds that both SUNADA and the APA disclose the protected resources. Is that right? No, Your Honor. I don't think that's the right interpretation. So that's on appendix 35. And let me walk, Your Honor, through that analysis. Okay. Just to let you know, you're into a rebuttal. Okay, thank you, Your Honor. So on page 35, towards the bottom, we have the same, we have the, in the middle of the second to last paragraph, it says we find that SUNADA, by specifically referring to its applications as web applications, strongly suggests that web pages are among the services it provides. So that's one flavor of the change in position. And then at the very end, it says, of that paragraph, it says, moreover, we find that AAPA expressly describes providing access to resources using URIs. So that's also a theory that's not in the petition. And then the conclusion is to say both SUNADA and AAPA teach this. So what it's saying is together they teach it. And that's the only way to read it, because earlier the board concluded that SUNADA does not disclose this limitation. Can you help me understand? What is the difference between saying, as a person born in Aries County, when I read a prior reference, or I read, yeah, prior reference, I understand this would be teaching something, versus, on the other hand, saying it discloses something. Is there a difference? Yes, Your Honor, there is. And we know there's a difference in the board's opinion, right? Because the board thinks it doesn't disclose, but it suggests. So what's the difference between the two? A suggestion is you don't actually say it. Someone would think, oh, maybe it's obvious. But that's not the argument that's advanced in the petition. So I guess that's what I'm asking. Do you think that they're saying it's obvious, or do you think that they're saying it's logical that a person of ordinary skill in the art would understand that this element is taught by this prior art reference, because logic tells me so. If they have a web server as a protected resource, that must mean that there's URLs or URIs. I think they're saying it's obvious, and the reason why is because the exact theory, the language of— It would have been obvious to one of ordinary skill in the art to modify this reference so that the web server uses a URL or a URI. Your Honor, the position I would go back to is the petition used, it discloses, and the final written decision says it doesn't disclose. With that, I'll leave the rest of my time for— I'm just trying to understand the difference between discloses and teaches. Well, it's not teaches. It's suggested. Actually, it says teaches. Well, teaches, it says— It's down at the bottom of the page on page 835. So this is Sonata and AAPA teaches. So this is a theory that's not advanced either, right? AAPA together with Sonata teach that. But that teaching is separate, right? I don't know, because I'm reading this differently than you. When they say both Sonata and AAP, I think they mean singularly. Both of them individually teach. I think in context of the sentence right above it, moreover, we find that AAPA expressly describes providing that, is giving the context as to the last sentence. So I think what this says is AAPA expressly describes. You and I both agree with that. But it says, I don't think Sonata expressly describes it, but it does teach it. Because it says we're going to have protected resources. They include protected resources on web pages. A person of ordinary skill and the art would read that to mean URLs. If we think teaches means this. Why am I wrong? Because, Your Honor, if we think teaches means the same thing as discloses, then the final written decision is inherently contradictory. Because at one point it says it doesn't disclose, and then later on it says teaches. That's not what I'm saying, but that's okay. Thank you. All right. We'll give you a little time. Thank you, Your Honor. Your Honor, Sean Blackburn from Sussman Godfrey for Zillow. May it please the Court. I'd like to start, actually, where you just left off, Judge Stoll. We know that your interpretation of page 35 is correct, because we can turn to page 71. We're discussing OASIS. If you go to page 71, we're discussing OASIS. It says expressly, As explained above, SUNADA teaches providing access to protected resources. It says nothing about the applicant admitted prior art. And it's very clear, I think, from the paragraph above, that he's saying that both of these are there. The one of ordinary skill and the art does not mean to kind of leave common sense at the door. Like, web applications have URLs. We cross-examined their expert on that using their own patents that say, Do you think the board said in its sentence about discloses, it was saying expressly discloses? Yeah. And if that's something different? So, well, partly if we go back to that, that was on anticipation. And there is some, like, if you read the exchange, it's actually not 100% clear what was being given away. If you go down to the second time the judge speaks, and you're no longer contending that SUNADA expressly discloses. Oh, sorry. That's Appendix 16. It's in the final description decision, I'm sorry, in which the judge is talking to Mr. Briggs, the lawyer for Rakuten. And Mr. Briggs is correct. If he had stopped there, he'd say, well, you just conceded he doesn't disclose. But if Mr. Briggs continues, he says, we're saying that SUNADA discloses URLs in the context of web applications being accessed by users. And when you're doing that, a person of ordinary skill in the art would understand that URLs are commonly used to do that. So they were giving up on their anticipation argument, partly because it doesn't teach the entire federated computing environment. And the board, in dealing with the anticipation argument, says, We find the petitioner has not shown that SUNADA discloses protected resources under our claim construction of the term. And accordingly, they've not shown by preponderance that it anticipates. But when we go to the obviousness analysis on page 35, it expressly says that SUNADA does teach providing access via URLs. Well, it's all a little confusing. So you must be saying that what the board said here at A17 was a mistake by the board? Not necessarily. There's no other way. It's crystal clear when the board says, We find the petitioner has not shown that SUNADA discloses protected resources under our claim construction. But it's also crystal clear they said it does in the obviousness section. Well, that's why I'm asking you to perhaps acknowledge that in your view, necessarily, in order to make sense of your position, that the board goofed at A17. I would hate to say the board goofed, but it's inarticulate. I think it's incorrect. It's incorrect. Okay. It's incorrect to say that it doesn't disclose the protected resources with respect to the URL limitation. And the reason is the URL limitation, if we step back. This is why I ask. Do you think on this page, the board here, when it said discloses, it's really suggesting expressly? Yes, that it doesn't say URL. Because later when it talks about the nitty-gritty, it says that SUNADA suggests, and when describing the omitted priorities, it says it expressly discloses. Would that be the distinction? I think that is the distinction, but I also think it goes further than saying SUNADA suggests. It says SUNADA teaches. That's the conclusion. Both at 35 and at 71, SUNADA teaches, which is not what it suggests. So you pick A35 and A71, and you think the board was wrong on A17? Yes. I mean, I think, if we step out for a second, of course they were wrong. Web applications are identified by URLs. We've all been alive since 1990. That's how it works. Well, I guess that depends on what the evidence shows. Well, and the evidence did show that. We cross-examined their expert audit, and their own patent said that web pages are identified by URLs. Well, at A35, when the board said web applications, it strongly suggests that web pages are among the services it provides. You don't think it's using the word suggests in the standard traditional Section 103 sense? Suggests motivation?  The TSM test? I don't think so. One, it's not a test anymore. But I think what you're saying is that… Strongly indicates? It's there, right? You say it's there. Well, no, they did. They did. They said it teaches later, the next sentence. They do. They get there. And they're dealing with web applications, all the evidence, and frankly, just, you know, having used the Internet. Web applications are identified by URLs. Nobody quibbled with that, other than to say it's some video app. What's that? The other side is obviously quibbling. No, their expert admitted it. Their challenge is procedural, Your Honor. About whether Sonata discloses… About whether we had the theory in our petition about Sonata disclosing. Or they say Sonata doesn't. See, their interpretation of the Board's opinion goes wrong from the very beginning. Because they say the Board relied only on these other two, which is that Sonata doesn't teach it, Sonata doesn't teach it, but OASIS and AAPA gap fill. They're missing the first part, which is that Sonata does teach. They don't challenge that. They don't really challenge that for substantial evidence. The evidence that web applications, as that term is used in Sonata, necessarily means URLs. It's laid out right here, right? Right where? So this is… I'm looking for a piece of evidence that I can use.  Well, so it is in the cross-examination of their expert… Your experts? I'm sorry? Did your experts say anything like web applications equals hyperlinked URLs? No, because it's impossible because we… not to bring up the time machine again, but this came up in claim construction from their brief. Our expert only comes in with a petition. We didn't talk about URLs, right? We just talked about protected resources. URLs came in through their claim construction. And then the Board was forced to look, well, is that fairly taught here? And it is. Okay. So no supplemental declaration from your expert? Not on that point, but we cross-examined their expert. Is this cross-examination testimony that you're talking about? So it is referred to in the reply in the appendix. The actual… that portion of his testimony is not in the appendix. It is, of course, still part of the record. And we can stop. And I was looking at that this morning. It's not actually in there. If you look in the reply, it cites it. And he was cross-examined on three or four IBM patents, one of which says that web pages are always identified by URLs. Okay. But it's for some reason not in the JA, and the Board didn't rely on it. The Board doesn't expressly cite it, but they say exactly what that says. No. Help me out here. I feel like you're doing double talk, and it's scaring me. Did the Board cite the quote?  No, Your Honor, they did not. The other side's expert. But we did, is what I'm saying. That's not what I care about. I care about what the Board found, and what it relied on. What is this cite that's on page 835? Last… the cite that's at the end of the first full paragraph. That is the patent. Okay. That is the patent. That is the 346 patent. Okay. It's correct. The court does not cite what they're relying on for for web applications in that thing. I didn't mean to imply that they did. Since Dr. Shamos acknowledges that, it was conventional. Correct. So it's above. Right. So, in fact, they talk about a reply right above. The petitioner argues that SUNADA discloses the combined use of the Internet with web applications, and they cite to… So the X1036, I believe, is… Dr. Shamos argues being cross-examined on the IBM patents that say what I said they said. Where is that? That is right here. It's in the middle of the first full paragraph on Appendix 35. Dr. Shamos acknowledges that prior to 346, it was conventional to use URLs for Internet communications such as web pages. Equivalent on the issue of certain videos. What about the combination theory that was presented underneath the FCE heading in your petition?  So, again, we said that protected resources were disclosed. We didn't discuss URLs because that was a claim construction that came later. I think they know in their brief that that became an agreed construction in the district court case, but that was five months after we filed our petition, so it wasn't something we had prior knowledge of up front when we filed ours. And so when the board construes protected resources, it goes to look and see, well, what are we saying? And I think it's, you know, if we go to the petition, I think we're on Appendix 323. No, sorry, that's their institution. Excuse me, I apologize. I'm sorry. Here we are. It is on, this section begins on page 142 of the appendix. And if we slip over to 143, we explain, as for FCE limitation, as explained, Sudan has closed its web applications, described such applications as providing services, and linked system functionality to services which participate in the SSL. We continue on. Again, we're talking about in the federated computing environment. I'm sorry, this is on page 143. 143. The bottom paragraph. Okay, thank you. Yes, the bottom full paragraph. Sudan has closed its web applications, described such applications as providing services, and linked system functionality to services which participate. If we go over to page 145, we continue, because again, we're talking about the federated environment. Like, you need links because it's a federated environment, correct? In discussing APA, the identity provider, which is what this is being used for here, right, therefore offers links to federated resources. The offer may be in the form of hyperlinks to resources at federated websites or more generally, federated domains. And so, there's not this separation between protected resources and a federated computing environment that IBM is trying to paint here. They're part and parcel. It's just what's in the box. If you have this federated computing environment, then it is, the APA, we would clearly disclose that the APA is teaching these federated domains and these resources. I think it's perfectly fair for the board to rely on it. And, to be clear, I mean, this is not a situation like in an invasive case or Belkin or anything like that where new evidence pops up in a reply brief and they're not given an opportunity to respond to it. This was day one. They had every opportunity to respond to these arguments and they just failed. Can I ask you a doctrinal question, a case-by-case question? I will hope to answer it. I hope you do as well. We're talking here about what might be thought of as some pretty fine distinctions between concepts like disclose for anticipation purposes, where there's a degree of precision, finickiness, I don't mean that in a pejorative way, because anticipation has some very important consequences, and maybe next down on the spectrum might be teach, and then there might be suggest. Is there in our case law, a case law that addresses the matter of alterations between what was precisely said in the petition and what the leader said in the proceeding, putting aside questions of notice? I don't think there's any question at all here about notice and opportunity to respond, because this all came up at the institution. This is about the law, about you really, really, really are stuck with what's in the petition, or maybe not quite so much. Is there anything that talks about the degree of difference between essentially what was said originally in the petition and what's said later? Because that feels to me like what's going on here. There is small differences that sometimes in the other context matters like anticipation, right? Express or inherent, that really is a very strong standard. But, and that's why I want to say core photonics and other kinds of cases that talk about, you know, you could do a little bit of development that, is there something that allows us to take into account how much of a small gradation there may be? Yes. I hope you understand that. Your Honor mentioned the core photonics case, but it's also, I think it goes, I think it gets wrapped into the abuse of discretion standard on their interpretation of the petition and what grounds it speaks to. And, you know, the VLSI case found that when the board gave notice of the interpretation that they had, then there was no violation. I think, you know, it doesn't, I don't think that the, that the law requires you to stick absolutely strictly to what was said in the petition, particularly when the claim construction changed things. You have to look at what was fairly taught. And I think in this situation, it's, Right, we do have case law that if the petition rests on one conception of what the claim means, but then, you know, perhaps either the patenter contests that or the board says something differently about the meaning of the claim that the petitioner is permitted to adjust to that understanding or present argument of why under that different construction, the prior art still renders the claim unpatentable. Right, and that's what we did here, right? I mean, we started, we don't mention URLs in the petition because it wasn't part of the construction that we were using, plain and ordinary meaning. And once they come in, then we started developing our evidence, which is mainly through cross-examination of their expert at that stage in a PTAB proceeding to show that this does in fact teach URLs and it's, you know, strongly implied if not taught or disclosed by the fact that they're using web pages and web applications. Your Honor, I notice that I'm well into my rebuttal. I think I will rest on the papers on our cross-examination unless you have any questions about our standing. We did receive the order. If not... No, I think I'll... Thank you. Thank you. All right. Let's give counsel two minutes. Would you like me to address the cross-appeal too, Your Honor? No, it wasn't raised by the other side. Okay, fair enough. Your Honor, I can see that there's in your minds, you know, an issue of what is the language, how crisp does it need to be? And I would submit that the issue that distinguishes this case from kind of the run-of-the-mill IPR in terms of what language was used and what's in the final written decision is the decision to mirror the language in the previous IPR. So I'm not here to argue that any time the language is a little bit different that there's an issue. But what I am here to argue is when there's an explicit decision, a strategic decision... Let me just ask, suppose there had been one additional sentence. The opening sentence says, this expressly teaches so we get anticipation. Collateral will stop along this element. A next sentence that says, and even if it doesn't, it certainly puts this idea pretty immediately into the mind of the skilled reader. Let's call that teaching. Let's call it suggestion. In what way would you be prejudiced? I think we would be prejudiced because they were advancing a collateral estoppel argument. So we had to respond in our... They still have their collateral estoppel argument. This is a next, not inconsistent alternative. In their mind, I believe, Your Honor, it was supposed to be very clear and it would have upset how clear it was to kind of depart from the initial petition. So I do think as kind of a statutory requirement under SAS and under this court's precedent, we have to stick with what the petition argued and this court is very, very particular about how things are used. For example, in the Orenstech case, which we cite, a block quote about the prior art was in the petition, but it was used for a separate context and the court said, you cannot switch the context in which you use that block quote. And then, oh, I'm sorry, that was the Amirakam case where that happened. In the Orenstech case, similarly, there was a theory of a motivation to modify a basis for finding, to modify a prior art reference and the court said, you can't use that motivation to modify to meet a limitation about a 30,000 pounds, you know, how much it had to be. And in both those circumstances, you know, the content was there, but the theory was not there. And that's what I would submit really distinguishes this case and why it's so important to look at what it was said. And my final point is, the counsel for Zillow said the board made a mistake and what the board made a mistake on was exactly the language that the petition used. We can't just ignore that, especially when the cross-appeal was about you can't have inconsistency in the petition. Mr. Husseyev, thanks very much. We're out of time. The case is submitted. Thank you, Your Honors. Thank you.